## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS

KENNETH V. SHULTS, COLLEEN M. SHULTS, )
SECOND AMENDMENT FOUNDATION, INC., )
and ILLINOIS STATE RIFLE ASSOCIATION, )
             )
            Plaintiffs, )
             )
v.                              )    Case No. 2:16-CV-2214
             )
GEORGE H. SHELDON, in his official capacity as )
Director of the Illinois Department of Children and )
Family Services, )
             )
             Defendant. )

### PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION TO DISMISS

NOW COME the Plaintiffs, KENNETH V. SHULTS, COLLEEN M.

SHULTS, SECOND AMENDMENT FOUNDATUON, INC., and ILLINOIS STATE

RIFLE ASSOCIATION, by and through LAW FIRM OF DAVID G. SIGALE, P.C.,

their attorney, and for their Response to the Defendants' F.R.Civ.P. 12(b)(6) Motion

to Dismiss, states as follows:

### INTRODUCTION

The Defendant instituted a policy that forced the Shultses, and every person

who fosters children through the State, to choose between fundamental Second

Amendment rights, and the ability to foster children. Besides being terrible policy,

it is unconstitutional.

The Defendant orders those fostering through IDCFS to comply with an sign

a Foster Family Firearms Agreement (Dkt. #10-4).  Though portions of the policy

are uncontroversial and not challenged in this suit, other portions deny Plaintiffs

the ability to defend themselves and their families, both in a vacuum and as compared to other types of parents in the State.

In compelling this choice, the Defendant is treating persons who foster (whether or not they also have natural or adopted children) differently from those who have only natural or adopted children. This discrimination, which serves no purpose, violates the Plaintiffs right to substantive due process and equal protection under the law pursuant to the Fourteenth Amendment, as well as those similarly-situated to Plaintiffs, such as members of the Plaintiff Second Amendment Foundation or Illinois State Rifle Association.

The policy also denies Plaintiffs their fundamental right to keep and bear arms under the Second Amendment to the United States Constitution. It is inequitable and improper that people trying to provide a better environment for children in need should have to make the decision required by the Defendant's policy.  Every day these unconstitutional policies are in force, they irreparably harm not only the Plaintiffs but potentially their families as well, including children foster and natural.

Besides being unconstitutional under any form of heightened scrutiny, the Defendant has no valid interest in denying the fundamental rights of handgun possession and self-defense to law-abiding Illinois residents whose only offense is wanting to help children.

Therefore, under the Second Amendment to the United States Constitution, *District of Columbia v. Heller*, 554 U.S. 570 (2008) and *McDonald v. City of Chicago*,

130 S.Ct. 3010 (2010), Plaintiffs have stated a valid claim, and Defendant's Motion to Dismiss should be denied.

## STATEMENT OF FACTS

•      Plaintiff Kenneth Shults is 37 years old, and resides with his family in Fairmount, Illinois. He is married to co-Plaintiff Colleen. Kenneth is a Project Manager for a computer-numeric control (CNC) machine shop in central Illinois, which manufactures and repairs custom machine parts. He has been in this industry for almost twenty years. Kenneth and his wife have been foster parents to two children in the State of Illinois since 2007, providing a stable environment to children without one, and plan to continue to do so in the future. They currently have one foster child, whom they are in the process of adopting, plus they have three natural children in their home (Complaint at ¶ 8).

•      For the last two years, Kenneth has been an instructor at a youth firearms safety camp in Bloomington, Illinois, focusing on safely handling and using weapons for all manner of shooting sports (Complaint at ¶ 9).

•      Plaintiff Colleen Shults resides with her family in Fairmount, Illinois. She is married to co-Plaintiff Kenneth. She works as a LPN nurse at Danville Correctional Center, part of the Illinois Department of Corrections. Colleen and her husband have been foster parents to two children in the State of Illinois since 2007, providing a stable environment to children without one, and plan to continue to do so in the future. They currently have one foster child, whom they are in the process

of adopting, plus they have three natural children in their home (Complaint at ¶ 10).

- In March, 2016, Colleen received a letter from the Illinois Department of Corrections – Central Intelligence Unit that prisoners in the IDOC system were using people-locator websites on the Internet to learn the home addresses of IDOC staff, including correctional officers and nurses. The letter warned Colleen and those like her to be careful and diligent for their safety (Complaint at ¶ 11).

- The Shultses are allowed to possess firearms in Illinois generally, but are prohibited by the IDCFS policy complained-of herein from possessing loaded functional firearms in their homes so long as they currently are foster parents, or plan to be foster parents in the future (Complaint at ¶ 12).

- The Shultses would possess loaded and functional firearms for self defense and defense of family, but refrain from doing so because they fear their foster children being taken away from them by the State, and/or being prohibited from being foster parents in the future, all due to the IDCFS policy complained-of herein (Complaint at ¶ 13).

- SAF is a non-profit membership organization incorporated under the laws of Washington with its principal place of business in Bellevue, Washington. SAF's membership includes foster parents residing in Illinois. SAF has over 650,000 members and supporters nationwide. The purposes of SAF include education, research, publishing and legal action focusing on the Constitutional right privately

to own and possess firearms. SAF brings this action on behalf of itself and its members (Complaint at ¶ 14).

- Members of SAF who are foster parents in Illinois would possess and carry loaded and functional concealed handguns in public for self-defense, but refrain from doing so because they fear their foster children being taken away from them by the State, and/or being prohibited from being foster parents in the future, all due to the IDCFS policy complained-of herein (Complaint at ¶ 15).

- ISRA is a non-profit membership organization incorporated under the laws of Illinois with its principal place of business in Chatsworth, Illinois. ISRA has over 17,000 members and supporters in Illinois, and many members outside the State of Illinois. The purposes of ISRA include securing the Constitutional right to privately own and possess firearms within Illinois, through education, outreach, and litigation. ISRA brings this action on behalf of itself and its members (Complaint at ¶ 16).

- Members of ISRA who are foster parents in Illinois would possess and carry loaded and functional concealed handguns in public for self-defense, but refrain from doing so because they fear their foster children being taken away from them by the State, and/or being prohibited from being foster parents in the future, all due to the IDCFS policy complained-of herein (Complaint at ¶ 17).

- Kenneth and Colleen Shults are members of SAF and ISRA (Complaint at ¶ 18).

- Defendant Sheldon is the Director of the Illinois Department of Children and Family Services. In Sheldon's official capacity, he is responsible for enforcing certain of Illinois's laws, customs, practices, and policies, specifically those challenged herein. In that capacity, Sheldon is presently enforcing the laws, customs, practices and policies complained of in this action. Specifically, Sheldon is the authority charged with processing and administering the foster parenting system in Illinois (Complaint at ¶ 19).

- Since as early as August 1, 2009, the IDCFS has had in effect Rule 402.8(g) (previously 402.8(i)) of the Licensing Standards for Foster Family Homes, which states:

> Any and all firearms and ammunition shall be locked up at all times and kept in places inaccessible to children. No firearms possessed in violation of a State or Federal law or a local government ordinance shall be present in the home at any time. Loaded guns shall not be kept in a foster home unless required by law enforcement officers and in accordance with their law enforcement agency's safety procedures.

(Complaint at ¶ 23.)

- Further, all foster parents are required to complete Form CFS 402-A, entitled "Acknowledgment of Compliance/Part 402 Licensing Standards for Foster Family Homes. Contained in CFS 402-A is "Section III. Firearms" is a recitation of Rule 402.8(g), and the requirement that the prospective foster parent make the following certification:

> I certify that there are no firearms on the premises, but will immediately notify the Licensing Representative and complete form CFS 452-2, Foster Family Firearms Arrangement, if I, or any member of the foster family home, acquires a firearm.

(Complaint at ¶ 24.)

- Form CFS 452-2 is entitled Foster Family Firearms Agreement ("FFFA"). The FFFA requires the prospective foster parents to provide the IDCFS with a list of all firearms in the home including their location, a list of all ammunition in the home including its location that must be in locked storage separate from any firearms, and to notify IDCFS in writing if there are any changes to the provided information (Complaint at ¶ 25).

- The Shultses were required to sign and abide to the content of the Acknowledgment of Compliance and the FFFA to continue as a foster home (Complaint at ¶ 26).

- On May 1, 2015, Defendant sent "Policy Guide 2015.08 – Enhanced Firearm Safety in Foster Family Homes" to the Shultses, which requires trigger locks on any firearms in the home, even if the firearm is locked in a gun safe separate from ammunition, with the key off the premises or only in the owner's possession (Complaint at ¶ 27).

- In addition, the Shultses were recently told by IDCFS employees that they would be required to present all firearms in their home to IDCFS employees for inspection, to ensure they had trigger locks. The Shultses are fearful of losing their foster daughter if they complain or do not comply with the policies listed in the paragraphs above (Complaint at ¶ 28).

## ARGUMENT

### Standard for Motion to Dismiss

#### F.R.Civ.P. 12(b)(6) Standard

"[W]hen considering whether to dismiss a complaint for failure to state a claim upon which relief can be granted, the Court takes the allegations in the complaint as true, viewing all facts -- as well as any inferences reasonably drawn therefrom -- in the light most favorable to the plaintiff. *Marshall-Mosby v. Corporate Receivables, Inc.*, 205 F.3d 323, 326 (7th Cir. 2000); *Bell Atlantic Corp.*, 127 S.Ct. at 1955 (citing *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 508, n. 1 [ ] (2002)). A well-pleaded complaint may proceed even if it appears "that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Bell Atlantic Corp.*, 127 S.Ct. at 1965. Nevertheless, the factual allegations in the complaint must be enough to raise a right to relief above the speculative level. *Bell Atlantic Corp.*, 127 S.Ct. at 1973-74 & n.14." *Manuel v. Lyles*, 2008 U.S. Dist. LEXIS 51433, 5-6 (N.D.Ill. June 30, 2008).

I.     **PLAINTIFF STATES A CLAIM FOR VIOLATIONS OF THEIR SECOND AMENDMENT RIGHTS.**

The Second Amendment provides:

> A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.

U.S. Const. amend. II.

The Second Amendment "is fully applicable against the States." *McDonald v. City of Chicago*, 561 U.S. 3025, 130 S. Ct. 3020, 3026 (2010).

The Amendment protects the right to "keep" as well as to "bear" operable arms, *i.e.*, "to *possess and carry* weapons in case of confrontation." *Heller*, 554 U.S. at 592 (emphasis added).

*Heller* considered whether Washington D.C.'s "prohibition on the possession of usable handguns in the home violates the Second Amendment . . . ." *Id.* at 573. The Court found that the requirement that firearms "be rendered and kept inoperable . . . makes it impossible for citizens to use them for the core lawful purpose of self-defense . . . ." *Id.* at 630. And it held that the Second Amendment "surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id.* at 635. "A statute . . . which requires arms to be so borne as to render them wholly useless for the purpose of defence, would be clearly unconstitutional." *Id.* at 629, quoting *State v. Reid*, 1 Ala . 612, 616-617 (1840).

St. George Tucker wrote: "Wherever . . . the right of the people to keep and bear arms is, under any colour or pretext whatsoever, prohibited, liberty, if not already annihilated, is on the brink of destruction." Tucker, *View of the Constitution of the United States,* 1 BLACKSTONE'S COMMENTARIES, ed. app. at 300 (1803). *Heller* endorsed this passage from Tucker. 554 U.S. at 606.

The constitutional text states categorically that the right "shall not be infringed." It is ludicrous that the First Amendment prohibition on "abridging the freedom of speech, or of the press" means that such freedom may be prohibited based on a legislative declaration, or agency policy, that the right is too dangerous

to allow.  The mere possibility of accidents does not justify prohibiting responsible persons from keeping operable arms, as "the enshrinement of constitutional rights necessarily takes certain policy choices off the table. These include the absolute prohibition of handguns held and used for self-defense in the home." *Id.* at 636.

Indeed, the fundamental right of self-defense is severely restricted by the Defendant's policies, as a locked-away firearm with no readily-available ammunition is of little help for those whose homes are being invaded, especially since one rarely has any advance warning before the intruder kicks in the door and breaks into the home.  In such situations, every second counts, and the IDCFS firearms policy robs homeowners of those valuable seconds, if not destroys the practical ability for self-defense entirely.

Defendant states that "the licensing regulations do not ban firearms in foster homes," (Dkt. # 10 at p.13), but this is disingenuous.  By requiring that any firearms be unloaded, locked away, inaccessible, outfitted with trigger locks, and separate from the also locked-up ammunition, it is clear the Second Amendment right has been destroyed in foster homes.

"[T]he Supreme Court made clear in *Heller* that it wasn't going to make the right to bear arms depend on casualty counts," *Moore v. Madigan*, 702 F.3d 933, 939 (7th Cir. 2012).  Nevertheless, Defendant tries to justify the IDCFS policy on the claim that armed, law-abiding citizens pose a threat to foster children.  Mainly, this was based on one unidentified and undetailed incident (Dkt. #10 at pp. 5-6).

10

Also, the Defendant cites to an unidentified "in-depth literature review" for the impetus of the policies (*Id.* at p.6), but there is likewise no detail provided.  In his Motion, there is also research cited, but it is contradicted and at best cannot be parsed out in a Motion to Dismiss.  In particular, Defendant cites to authorities that supposedly show that a gun kept in the home for self-defense is dangerous to children in the home.  This research has been debunked by (1) the National Research Council (NRC) of the National Academies of Science and (2) the Centers for Disease Control (CDC).

The NRC reviewed the body of firearms literature, and concluded that the studies: (i) utterly failed to establish that gun ownership increased the risk of violence to the owner, (ii) were incapable of throwing light on "the impact of firearms on homicide or the utility of firearms for self-defense," and (iii) made conclusions "that owning firearms for personal protection is 'counterproductive' and that 'people should be strongly discouraged from keeping guns in the home' " that were simply "not tenable."  FIREARMS AND VIOLENCE: A CRITICAL REVIEW 118-19 (Charles F. Wellford *et al.* eds., 2005) (citation omitted).

The CDC likewise found that the research was flawed and "inconsistent" and as a result there was "insufficient evidence" to conclude that firearms injury can be reduced either by "[b]ans on specified firearms or ammunition" or by requiring gun owners "to store . . . firearms locked . . . [or] unloaded" in the home. *See First Reports Evaluating the Effectiveness of Strategies for Preventing Violence: Early Childhood Home Visitation and Firearms Laws*, 52 MORBIDITY & MORTALITY

WEEKLY REP. 15, 17-18 (Oct. 3, 2003), available at

www.cdc.gov/mmwr/PDF/rr/rr5214.pdf; Robert Hahn et al., *Firearms Laws and the*

*Reduction of Violence: A Systematic Review*, 28 AM. J. PREV. MED. 40, 40, 49, 56

(2005).

      Armed civilians, even though they greatly outnumber police officers, make

far fewer mistakes with their firearms than do the police.  Each year there are

approximately thirty instances in which a civilian mistakenly shoots and kills an

innocent individual who was not actually a burglar, mugger, or similar assailant—

but "[o]ver the same period the police erroneously kill five to eleven times more

innocent people."  *See* JOYCE LEE MALCOLM, *GUNS AND VIOLENCE: THE*

*ENGLISH EXPERIENCE* 239 & n.71 (2002).  Further, armed civilians are an asset

to public safety: "Regardless of which counts of homicides by police are used, the

results indicate that civilians legally kill far more felons than police officers do."

*See* Gary Kleck, *Keeping, Carrying, and Shooting Guns for Self Protection*, in DON

B. KATES, JR. & GARY KLECK, THE GREAT AMERICAN GUN DEBATE:

ESSAYS ON FIREARMS & VIOLENCE 199 (1997).

      In fact, the Defendant's firearm rules and policies have an especially severe

impact on those who are least capable of defending themselves against more

physically powerful assailants while they are struggling to open a gun-safe or get to

the separate location where the ammunition is stored in order to load the firearm.

In general, women are smaller and less muscular than the male criminals who prey

on them, and every second of delay that the Defendant's policy imposes on its

female foster parents could be the difference between life and death.  When the real-world example of Colleen Shults being in potential danger due to her employment is considered, the Defendant's policy is particularly harsh, and results in a decision that the Defendant passes off cavalierly (If the Plaintiffs want Second Amendment rights, don't be a foster parent), but is truly much more complicated and untenable than that.

Using the two step framework laid out in *Ezell v, City of Chicago*, 651 F.3d 684 (7th Cir. 2011), the Defendant's firearms rules and policies cannot survive constitutional scrutiny.  As in *Ezell*, Plaintiffs are the law-abiding responsible citizens who have full Second Amendment rights under *Heller*.  651 F.3d at 708. Banning functional firearms from home use clearly implicates Second Amendment rights (*See Heller*,  554 U.S. at 636).  Because the Defendant's rules and policies strike at the core of the Second Amendment right (*Id.* at 630), strict scrutiny applies.

The IDCFS's stated reason of protecting foster children is almost certainly considered a compelling interest; in fact, the Plaintiffs bring this suit so that they may be better able to protect foster children and the rest of their family.

However, the Defendants' rules are not narrowly tailored to achieve that interest.  While, as noted in the recent scheduling conference, the answer to this issue may lie in the eventual expert testimony, but it is clear that firearms have successfully been used for self-defense many times, which is something the State very much wants to ignore.

At least 19 professionally conducted national surveys have specifically asked respondents whether they had used a gun for self-protection. Despite wide variation in the details of the surveys, all indicated huge numbers of defensive gun uses each year, ranging from 800,000 to 3.6 million (Kleck, Gary, *The Frequency of Defensive Gun Use*, Chapter 6 in Armed, edited by Gary Kleck and Don B. Kates. NY: Prometheus Books., pp. 214-229 (2001)). The most technically sound of the surveys indicated there were 2.5 million defensive gun uses in 1992 (Kleck, Gary and Gertz, Marc, *Armed Resistance to Crime: The Prevalence and Nature of Self-Defense with a Gun*, J. of Criminal Law and Criminology, v.86, n.1, pp.150-187 (1995)).

That survey indicated that 36% of the defensive uses were carried out near but not in the defender's home and another 27% were carried out in locations that were neither near nor in the defender's home (*Id.* at 185). This leaves 37% of the defensive gun uses to have occurred in the defender's home. Thus, anywhere from 296,000 to 1,332,000 defensive uses in 1992 occurred in the defender's home, and anywhere from 288,000 to 1,296,000 defensive uses in 1992 occurred near the defender's home.

Since crime rates are only about half as high today as in 1992, the number of defensive gun uses is probably likewise about half what it was back then - perhaps about 1.25 million. Nevertheless, the number of defensive uses is still enormous. As a point of reference, in 2014 about 466,110 crimes were committed with firearms, including both crimes reported to the police and crimes not reported (U.S. Bureau of Justice Statistics. 2016. *Criminal Victimization, 2014.* Revised September 29, 2015.

Available online at http://www.bis.gov/content/pub/pdf/cvl 4.pdf, p.3).  Defensive

uses of guns by crime victims therefore appears to be about three times more

common than crimes committed by offenders using guns.

Further, when people defend themselves with firearms, they are less likely to

be injured or lose property than crime victims in otherwise similar circumstances

who use other defensive strategies or who do not resist.  Any position to the

contrary is inconsistent with the best available research evidence.

Defensive gun use (DGU) is effective as well as frequent. The best available

evidence on the effect of DGU on whether the victim is injured or loses property was

generated in a series of analyses of data generated by the U.S. Census Bureau's

National Crime Victimization Survey, which provides detailed information on self-

protective actions about the largest available, nationally representative sample of

crime victimization incidents that Gary Kleck conducted with a series of colleagues

(Kleck, Gary. *Crime Control Through the Private Use of Armed Force*, Social

Problems 35(l):1-21 (1988); Kleck, Gary, and Susan Sayles, *Rape and Resistance*,

Social Problems 37(2):149-162 (1990); Kleck, Gary, and Miriam DeLone, *Victim

Resistance and Offender Weapon Effects In Robbery*, Journal of Quantitative

Criminology 9(1):55-82 (1993); Tark, Jongyeon, and Gary Kieck. *Resisting Crime:

The Effects of Victim Action on the Outcomes of Crimes.* Criminology, 42(4):861-909

(2004).

These studies uniformly indicate that crime victims who use guns in self-

protection are less likely to be injured or lose property than otherwise similar crime

victims who either used other self-defense strategies or did not resist at all. On the rare occasions that gun-using victims were injured, the injuries were inflicted on the victims before the victims used their guns defensively. Further, victims who defended themselves with guns tended to do so in more desperate circumstances, *i.e.* circumstances more threatening to the victim, than those who adopted other self-protection strategies. Gun users were more likely to be outnumbered, to be facing offenders with weapons, and to have already been injured before wielding the gun in self-defense. It is therefore all the more impressive that gun defenders managed to come out of the crimes with so little harm. As one measure of success in avoiding harm, the Tark and Kleck (2004) analysis found that only 2.4% of crime victims who used guns suffered any kind of injury after the defensive gun use, and less than 1% suffered any injury more serious than cuts and bruises (p. 878).

Thus, there is substantial public benefit in allowing law-abiding citizens to possess firearms for self-defense purposes, a benefit that would be all but eliminated since foster parents are denied the right guaranteed in *Heller* to possess functional firearms for self-defense purposes of (at the least) hearth and home.  The Defendant's rules and policies are not narrowly tailored to achieve their claimed benefit.  At the least, Plaintiffs have stated a claim that the Defendant has violated the Plaintiff's Second Amendment rights.  The Defendant's Motion to Dismiss should be denied.

## II.   THE DEFENDANT'S POLICY VIOLATES THE FOURTEENTH AMENDMENT'S EQUAL PROTECTION AND DUE PROCESS CLAUSES.

Section 1 of the Fourteenth Amendment provides, in relevant part:

> No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; *nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.*

U.S. Const. amend. XIV (emphasis added).

The Supreme Court has held:

> Our prior decisions recognizing right to privacy guaranteed by the Fourteenth Amendment included "only personal rights that can be deemed 'fundamental' or 'implicit in the concept of ordered liberty.' *Palko v. Connecticut*, 302 U.S. 319, 325 (1937)." *Roe v. Wade*, 410 U.S. 113, 152 (1973). This privacy right encompasses and protects the personal intimacies of the home, the family, marriage, motherhood, procreation, and child rearing.

*Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 65 (U.S. 1973) (Emphasis added).

In *Pierce v. Soc'y of Sisters*, 268 U.S. 510 (1925), the Supreme Court stated:

"Under the doctrine of *Meyer v. Nebraska*, 262 U.S. 390 [(1923)], we think it entirely plain that the Act of 1922 [requiring public schooling for minors] unreasonably interferes with the liberty of parents and guardians to direct the upbringing and education of children under their control . . . [t]he child is not the mere creature of the State; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations." *Id.* at 534-535.

"It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder. *Pierce v. Society of Sisters*, *supra*. And it is in recognition of this that these decisions have respected the private realm of family life which the state cannot enter." *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944).

While that principle apparently did not extend to Jehovah's Witnesses having their children selling religious literature on the street (*Id.* at 170-71), it does extend to parents exercising lawful self-defense measures to protect those children in case of violent attack.

These principles have been more recently affirmed in *Troxel v. Granville*, 530 U.S. 57 (2000). In *Troxel*, the Court held that the Application of Washington state child-visitation-rights statute to allow visitation rights to paternal grandparents violated the mother's Fourteenth Amendment due process right to bring up her children. The Court stated: "The Fourteenth Amendment provides that no State shall 'deprive any person of life, liberty, or property, without due process of law.' We have long recognized that the Amendment's Due Process Clause, like its Fifth Amendment counterpart, 'guarantees more than fair process.' *Washington v. Glucksberg*, 521 U.S. 702, 719, 138 L. Ed. 2d 772, 117 S. Ct. 2258 (1997). The Clause also includes a substantive component that 'provides heightened protection against government interference with certain fundamental rights and liberty interests.' 521 U.S. at 720; *see also Reno v. Flores*, 507 U.S. 292, 301-302, 123 L. Ed.

2d 1, 113 S. Ct. 1439 (1993). The liberty interest at issue in this case -- the interest of parents in the care, custody, and control of their children -- is perhaps the oldest of the fundamental liberty interests recognized by this Court." *Troxel*, 530 U.S. at 65.

It is perhaps more complicated to determine liberty interests when dealing with foster children, although that concern should not exist when dealing with the natural or adopted children who are in the home with foster children (both of whom are potentially endangered due to the Defendant's policies), though it is clear that the foster parents do have protectable interests in caring for their foster children.

"By providing care for children and supporting the attachment of children to their families in a manner sensitive to each child's and family's unique needs, the foster parent serves the child, the family, and the community." 20 ILCS 520/1-5.

Pursuant to 20 ILCS 520/1-15, foster parents have the right to due process as to any investigation of them.  Further, they have the responsibility to "advocate for children in the foster parent's care." 20 ILCS 520/1-20(3).

Further, the Tenth Circuit has recognized that foster relationships can be similar to natural-born relationships.

> [T]he Supreme Court has made clear that "biological relationships are not exclusive determination of the existence of a family." [*Smith v. Organization of Foster Families for Equality & Reform*, 431 U.S. 816, 843, 97 S. Ct. 2094, 53 L. Ed. 2d 14 (1977) (hereinafter "*OFFER*")]. Although a biological relationship bears some import, the Court stressed that "the importance of the familial relationship, to the individuals involved and to the society," rests in part on "the emotional attachments that derive from the intimacy of daily association, and from the role it plays in promoting a way of life through the

instruction of children." *Id.* at 844 (quotation and alteration omitted). "No one would seriously dispute that a deeply loving and interdependent relationship between an adult and a child in his or her care may exist even in the absence of blood relationship." *Id.*

*Elwell v. Byers*, 699 F.3d 1208, 1215-1216 (10th Cir. 2012).

> The *OFFER* Court acknowledged that foster families and biological families differ in at least one important respect: Unlike biological families, "whatever emotional ties may develop between foster parent and foster child have their origins in an arrangement in which the State has been a partner from the outset." *Id.* at 845. Nonetheless, the Court indicated that the liberty interest in family association may extend to foster parents in certain circumstances: At least where a child has been placed in foster care as an infant, has never known his natural parents, and has remained continuously for several years in the care of the same foster parents, it is natural that the foster family should hold the same place in the emotional life of the foster child, and fulfill the same socializing functions, as a natural family. For this reason, we cannot dismiss the foster family as a mere collection of unrelated individuals. *Id.* at 844.

*Elwell*, 699 F.3d at 1216.

> In *Spielman v. Hildebrand*, 873 F.2d 1377 (10th Cir. 1989), we applied *OFFER* to a case involving preadoptive parents. We noted that the status of preadoptive parents "differs significantly" from that of typical foster-care parents, who care for children on a temporary basis because the object of the preadoptive placement was to locate a "permanent, stable home." *Id.* at 1384. Although they "have not yet attained the status of adoptive parents, who like natural parents, have a protected liberty interest in their familial relationships with their children," preadoptive parents have a more "significant relationship than foster care because of the possibility of developing a permanent adoptive relationship." *Id.* at 1384. On this basis, we distinguished several sibling-circuit cases holding that typical foster families lack a protected liberty interest in maintaining the foster home. *Id.*

*Elwell*, 699 F.3d at 1216.

The Shultses, who have fostered children, and are adopting one of them, certainly fit into the category of protected individuals described in *Elwell*, as do many others in the State of Illinois. Given that this case deals with two fundamental rights – that of the right to raise children and the right to armed self-defense, the Defendant's firearms policy must survive strict scrutiny. Governmental classifications are subject to strict scrutiny under the Equal Protection Clause if they burden a fundamental right or target a suspect class. *See Plyler v. Doe*, 457 U.S. 202, 216-217 (1982). "To survive strict scrutiny, the government must show that its classification is narrowly tailored to achieve a compelling government interest." *United States v. Virginia*, 518 U.S. 515, 524 (1996) (gender discrimination). The State's firearms policy, discriminating and burdensome as it is, does not meet this standard.

And this is especially stark when it is considered that parents with only natural or adopted children enjoy full rights of self-defense under the Second Amendment.  It is only when foster children are added to the mix that the right to armed self-defense dissipates. And if the foster parents decline to give up their right to armed self-defense, they risk losing their foster children and their future abilities to foster. This is a violation of both sides of the Fourteenth Amendment coin: Plaintiffs' equal protection rights and substantive due process rights.

To be clear, Plaintiffs are not arguing (contrary to Defendant's argument on page 8 of his Response) that there is a fundamental constitutional right to be a foster parent, and thus the cases involving the rights of the family status of foster

parents versus birth parents are irrelevant.  *See*, *e.g., Procopio v. Johnson*, 994 F.2d 325 (7th Cir. 1993).  Further, Plaintiffs do not dispute that the State has the ability to set foster parent qualification and training requirements, such as in the Illinois Administrative Code sections cited by Defendant (Dkt. #10 at p.3-4), and to regulate the foster care system within constitutional limits, including things like water temperature, insuring financial stability for fostering, and having a telephone (Dkt. #10-3).  However, the case law is clear that once one becomes a foster parent that certain liberty interests attach to that status, per Section 15 of the Foster Care Act.

Rather, the question is whether the State can condition the ability to be a foster parent on the foregoing of Second Amendment rights, and, once one is a foster parent who does enjoy a liberty interest, can that interest be threatened or revoked for exercising a fundamental constitutional right such as in the Second Amendment. In either case, the answer is no.[1]

Plaintiffs are also aware the District Court in *Jones v. Ada S. McKinley Community Services*, 1989 U.S. Dist. LEXIS 14312 (N.D.Ill. 1989) noted in *dicta* that foster parents are not a protected class, but Plaintiffs assert the law has evolved in the intervening 28 years, and it cannot be denied that foster parents are afforded at least some liberty interests when it comes to the care and raising of the children in their home.  Further, the Courts' holdings in *Heller*, *McDonald* and *Moore* unequivocally show that the Second Amendment right to armed self-defense is fundamental, both inside and outside the home.  Whatever level of heightened

---

[1] Although being as this is a Motion to Dismiss, at a minimum the answer should be to determine that on the merits after the discovery process.

scrutiny is applied to the Defendant's policy, the policy does not meet the standard. Plaintiffs have stated a claim in their Complaint, and the Defendant's Motion to Dismiss should be denied.

<u>CONCLUSION</u>

WHEREFORE, the Plaintiffs, KENNETH V. SHULTS, COLLEEN M. SHULTS, SECOND AMENDMENT FOUNDATION, INC., and ILLINOIS STATE RIFLE ASSOCIATION, requests this honorable court to deny the Defendant's Motion to Dismiss in its entirety, and for any and all further relief as this court deems appropriate.

Dated: January 5, 2017                    Respectfully submitted,


                                         /s/ David G. Sigale
                                         Attorney for Plaintiffs


David G. Sigale (Atty. ID# 6238103)
LAW FIRM OF DAVID G. SIGALE, P.C.
799 Roosevelt Road, Suite 207
Glen Ellyn, IL 60137
630.452.4547
dsigale@sigalelaw.com

## <u>CERTIFICATE OF ATTORNEY AND NOTICE OF ELECTRONIC FILING</u>

The undersigned certifies that:

     1.    On January 5, 2017, the foregoing document was electronically filed with the District Court Clerk *via* CM/ECF filing system;

     2.    Pursuant to F.R.Civ.P. 5, the undersigned certifies that, to his best information and belief, there are no non-CM/ECF participants in this matter.


          /s/ David G. Sigale
          Attorney for Plaintiffs

David G. Sigale (Atty. ID# 6238103)
LAW FIRM OF DAVID G. SIGALE, P.C.
799 Roosevelt Road, Suite 207
Glen Ellyn, IL 60137
Tel: 630.452.4547
Fax: 630.596.4445
dsigale@sigalelaw.com